UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No.: 4:22-cr-102 AGF (DDN) ) |
| JAMES DEAN KUKAN, | ) ) ) |
| Defendant. | ) |

**MOTION TO REVOKE DETENTION ORDER**

COMES NOW Defendant, James Kukan (Kukan), by and through counsel, and hereby moves this Court, pursuant to 18 U.S.C. § 3145(b), to revoke the detention order of the magistrate judge and admit him to bail on a combination of conditions of release that will reasonably assure his appearance as required and the safety of any other person and the community. In support of this motion, Defendant states as follows:

**I.      18 U.S.C. § 3142(e)'s Rebuttable Presumption**

Title 18 U.S.C. § 3142(e)'s rebuttable presumption applies to Kukan. According to the magistrate judge, he did not rebut this presumption. *See* Order of Detention Pending Trial at 2. The magistrate judge erred in so finding. Section 3142(e) puts a "limited burden of production," *see United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003) (citation omitted), on the defendants to whom it applies. This burden "is not a heavy one to meet," *United States v. Dominguez,* 783 F.2d 702, 707 (7th Cir., 1986), and, even when it applies, the burden of persuasion remains with the government to show by the requisite burden of proof[1] that no combination of conditions of

---
[1] The preponderance of evidence standard applies to the risk of flight analysis; the clear and convincing evidence standard applies to the risk of danger analysis. *See Abad*, 350 F.3d at 795, 797. The clear and convincing standard

1

release will *reasonably assure* the appearance of the accused as required or the safety of the community or any other person. *See Abad*, 350 F.3d at 797. Kukan can rebut this presumption.

## II.     The § 3142(g) Factors

Kukan is a lifelong resident of the Eastern District of Missouri,[2] who can reside with his parents in Winfield, Missouri or with his aunt in St. Ann. He has one sibling, a brother who resides with his parents. He has no meaningful contacts outside Missouri.

Since he graduated from high school, Kukan has worked in the Eastern District of Missouri, where he has maintained employment with a single employer for 16 to 17 years.

Kukan has an estimated net worth of $145,000. But very few of his assets are liquid, and the assets he does have are tied up in a recently initiated divorce. In other words, he does not have the means to flee, even if he wished to. Kukan has never travelled abroad, and he has no passport.

---

represents a heightened burden of proof and has been characterized by the Eighth Circuit as "evidence which 'produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Cornell v. Nix*, 119 F.3d 1329 (8th Cir. 1997) (citation omitted). Unsurprisingly, courts apply this standard in important, often life altering and life-ending contexts. *See, e.g., Cruzan v. Director, Missouri Department of Health*, et al., 497 U.S. 261, 283 (1990) (upholding clear and convincing standard for a party who seeks "to terminate an incompetent individual's life-sustaining treatment"); *Santosky v. Kramer*, 455 U.S. 753-766-767 (1982) (requiring clear and convincing evidence for termination of parental rights); *Addington v. Texas*, 441 U.S. 418, 426-427 (1979) (requiring clear and convincing evidence for involuntary commitment). Presumably, this standard's inclusion in the Bail Reform Act reflects the significance of bail determinations generally and the substantial burdens pretrial detention imposes on pretrial detainees. *See, e.g.*, Samuel R. Weisman, *Pretrial Detention and the Right to be Monitored*, 123 Yale L.J. 1344, 1353-54 (2014) (noting pretrial detainees are "physically barred from the outside world [and] restricted to limited visits by family members and attorneys. Their conversations are constantly monitored by guards and other inmates, their mail is searched, and they are subjected to frequent and invasive searches and pat-downs to ensure institutional safety."); *see also* Albert W. Alschuler, *Preventative Pretrial Detention and the Failure of Interest Balancing Approaches to Due Process*, 85 Mich. L. Rev. 510, 517 (1986) ("[T]he burdens of pretrial detention are not limited to losses of time and money. The jobs of detained defendants frequently disappear and friendships and family relationships are disrupted. Indeed, families and friends sometimes lose interest and no longer visit or write…. Moreover, incarceration affects a defendant's physical appearance and impedes his ability to consult with lawyers, locate witnesses, and otherwise prepare a defense).

[2] From age 9 to 11, Kukan's family resided in Kansas. *See* Pretrial Services Report at 1. At al other times, he and his family resided in Missouri. *See id*.

2

Kukan does not have a history of mental health issues that might compromise his judgment. He does have a history of drug abuse. But this history is not extensive, and it doesn't distinguish him from the many defendants within this district with more substantial substance abuse histories who courts have admitted to bail with success.

Kukan's criminal history is not extensive, either. It consists of two misdemeanors and a felony drug offense from about 15 years ago for which he received and successfully completed an SIS probation.

Kukan does have three prior failures to appear. But no evidence indicates that he ever willfully failed to appear or fled from justice. More importantly, he saw each of his prior cases through to completion despite these instances of non-appearance.

Two § 3142(g) factors weigh against these other factors and in favor of detention: the weight of the evidence and the nature and circumstances of the offense. But "[t]he weight of the evidence is the least important of the [§ 3142(g)] factors," *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985), and "is only one of the factors relevant to detention." *United States v. Dominguez*, 783 F.2d 702, 706 (7th Cir. 1986).

In addition, in the bail context, the weight of the evidence and the nature and circumstances of the offense hold value only insofar as they serve as valid predictors of the relevant risks—risk of flight or danger to the community; neither factor is meant to serve as a proxy for guilt or to authorize detention on that basis. *See Motamedi*, 767 F.2d at 1408 (9th Cir. 1985) ("Although the statute permits courts to consider the nature of the offense and the evidence of guilt, the statute neither requires nor permits a pretrial determination that the person is guilty. These factors may be considered only in terms of the likelihood that the person will fail to appear or will pose a danger to the community.") *Id*; *see also United States v. Stone*, 608 F.3d

939, 948 (6th Cir. 2010) ("This factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of defendant's guilt."); *United States v. Gray*, 651 F.Supp.432, 436 (W. D. Ark. 1987) ("[T]he court does not believe that it can presume or that any court should presume that every person charged is likely to flee [or endanger the community] simply because the evidence against him appears to be weighty. If that were the case, the court can think of few instances where a person would be allowed to remain free pending trial. Such a presumption would appear to be tantamount to a presumption of guilt, a presumption that our system simply does not allow."); 18 U.S.C. § 3142(j) ("Nothing in this subsection shall be construed as modifying or limiting the presumption of innocence.").

Importantly, neither of these factors serves as a particularly valid predictor of risk of flight or danger. In fact, statistically, Kukan is exceedingly unlikely to flee or commit an offense while on bond. For example, of the federal defendants admitted to bail between 2008 and 2010, only 1 percent "failed to make court appearances."[3] Moreover, this flight rate has remained essentially the same for about the last 28 years.[4] Indeed, within this very district, the historical flight rate has remained at or below 1 percent.[5]

---

[3] *See* U.S Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Special Report*, *Pretrial Release and Misconduct in Federal District Courts, 2008 – 2010* at 3 (Nov. 2012).

[4] *See* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Pretrial Release of Federal Felony Defendants* at 2 *(Feb. 1994); See also* U.S. Department of Justice, Office of Justice, Bureau of Justice Statistics, *Special Report, Pretrial Detention and Misconduct in Federal District Courts, 1995-2010* at 8 *(Feb. 2013).*

[5] According to Office of Pretrial Services and the Administrative Office of the United States Court, less than one percent of defendants within this district, if any, have fled in recent years.  *See e.g.,* Federal Pretrial Services – Cases Terminated, By Type of Disposition, available at www.uscourts.gov/statistics-reports/caseload-statistics-data-tables.; see also According to Office of Pretrial Services and the Administrative Office of the United States Court, less than one percent of defendants within this district, if any, have fled in recent years.  *See e.g.,* Federal Pretrial Services – Cases Terminated, By Type of Disposition, Table H-13, available at www.uscourts.gov/statistics-reports/caseload-statistics-data-tables.

4

Likewise, in 2014, only 1% of all federal defendants charged with a violent offense were re-arrested for a felony while on bond; 99% were not. *See* United States Department of Justice, Federal Justice Statistics, 2014 Statistical Tables, Table 3.3 (March 2017). Similarly, in 2019, only 2% of all released federal defendants were re-arrested for any reason while under pretrial supervision. *See* Administrative Office of United States Courts, Pretrial Services Violations Summary Report for the 12-Month Period Ending December 31, 2019. What's more, this remarkably low re-arrest rate held essentially the same across districts with the highest and lowest release rates. *See*, Siegler, Alison & Zunkel, Erica, Rethinking Federal Bail Advocacy to Change the Culture of Detention at p. 4 (2020), available at https://ssrn.com/abstract=3601230. In other words, as release rates increased, crime did not.

### III.   Kukan's Proposed Conditions of Release

Kukan will reside with his parents at their home in Winfield or with his aunt in St. Ann. His parents will serve as third-party custodians and post their home as collateral to secure his release.[6] In addition, Kukan will submit to home incarceration and wear a location monitor to track his whereabouts 24 hours-a-day. He will also submit to a condition that prohibits contact, direct or otherwise, with his wife and children. He will submit to any other condition this Court thinks advisable, as well.

### IV.   Conclusion

In the Bail Reform Act, Congress sought to demonstrate its concern for a "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community." S. Rep. No. 98-225. p. 11 (1983) U.S. Code Cong. & Admin. News

---

[6] Kukan's parents have $50,000 to $75,000 in equity in their home.

1984, p. 3189. For these "demonstrably dangerous defendants" who pose a "strong probability" and "especially grave risk" of criminal activity, Congress deemed detention appropriate. *Id*. at 3188-90 (emphasis added). For the remainder, it did not. *See id*., ("It is anticipated that [pretrial release] will continue to be appropriate for the majority of Federal defendants.").[7] Kukan does not fit within this small class of demonstrably dangerous defendants. Available conditions of release will reasonably assure the safety of any other person and the community. For these reasons, this Court should admit Kukan to bail on the proposed combination of conditions of release and any other conditions this Court thinks appropriate.

Respectfully submitted,

By: /s/ Adam D. Fein

ADAM D. FEIN
Attorney for Defendant
120 S. Central Avenue, Suite 130
Clayton, Missouri 63105
(314) 862-4332
afein@rsflawfirm.com.

---

[7] Over time, federal court detention practices have upset this congressional expectation. In fact, since the Bail Reform Act was passed in 1984, "[t]he federal detention rate has been steadily increasing. Twenty years ago, less than half of defendants were held pretrial; now the figure is nearly 75 precent." Roland, Matthew, Chief, Probation and Pretrial Services Office Administrative Office of the United States Courts, The Rising Federal Pretrial Detention Rate, in Context at 1 (Sept. 2018). Several factors have contributed to this increase, among them, unintended consequences of the presumption statute, *see id*., (the "'presumption of detention was created with the best of intentions: detaining the worst of the worst defendants who clearly posed a significant risk of danger to the community by clear and convincing evidence. Unfortunately, it has become an almost de facto detention order for almost half of all federal cases. Unfortunately, research indicates that the enumerated offenses may not be the best predictors of risk of flight or danger to the community. Consequently, the Judiciary has suggested that Congress reexamine the presumption provisions.") (citation omitted), and the statute's tendency to mistarget some sexual offenses. *See* Austin, Amaryllis, The Presumption for Detention Statute's Relationship to Release Rates, Federal Probation (Dec. 2017), p. 55-56. (for "sex offenses, as risk levels increase, fewer and fewer cases are subject to the presumption, indicating that for these charges, the presumption may be targeting lower-risk defendants rather than higher-risk defendants. One potential explanation may be that while all sex offenses against minors (known as Adam Walsh cases) are presumption cases, many defendants charged with these offenses do not have significant prior criminal histories and are usually categorized as low-risk defendants. By contrast, a defendant charged with a violent sexual assault is more likely to have a substantial criminal history and a higher risk level, yet, because the victim is an adult, the violent sexual assault may not be categorized as a presumption case.").

6

## CERTIFICATE OF SERVICE

      I hereby certify that on April 11, 2022, the foregoing was electronically filed with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Mr. Kyle Bateman, Assistant United States Attorney.